THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>SEBASTIEN RAOULT,<br>Defendant. | No. CR21-109-RSL<br><br>SEBASTIEN RAOULT'S SENTENCING MEMORANDUM |

Sebastien Raoult respectfully requests that this Court impose a term of imprisonment of 25 months (24 months on Count 8, consecutive to one month on Count 2). This case requires a careful balancing of multiple mitigating factors against the seriousness of the offense and an advisory guideline range that overstates Mr. Raoult's culpability. The Probation Department thoughtfully recommends a sentence of 36 months after careful consideration of Sebastien's age, background, experience in prison in Morocco, and low risk of recidivism.

## I. INTRODUCTION

Sebastien is a first-time, non-violent offender who poses little risk of recidivism. A sentence longer than 25 months would serve little purpose. A 25-month prison term is also warranted for the following reasons:

- Sebastien is only 22 years old and much of the offense conduct took place when he was 19 years old. His youth is an important mitigating factor.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

- Sebastien is a thoughtful, intelligent, and considerate person with no prior criminal history. The support letters from those who have known him for years describe him as a caring and outgoing young man who understands the mistakes he has made and the impact of the offense on the victimized companies.

- This offense conduct took place after a series of hardships in Sebastien's family, and he feels terrible for what he has put his family through. Recently, his mother Catherine suffered a stroke and was hospitalized for about two weeks. She may not be able to travel for the sentencing hearing. Sebastien feels tremendous grief for the worry, shame, and disappointment he has caused his family. His remorse for the harm caused to his family will serve as a powerful deterrent to returning to criminal activity.

- The guideline range overstates the seriousness of this nonviolent offense that did not endanger anyone.

- After his arrest in Morocco, Sebastien spent his first eight months of custody in a Moroccan jail where the conditions were abysmal. He also will be deported upon completion of his sentence, making him ineligible for minimum security designation, prerelease, or earned-time credits.

- The agreed-upon loss amount, more than $6 million, does not represent the proceeds Mr. Raoult received as a result of his offense conduct. To be clear, Sebastien earned some profits from hacking activities, and he has admitted to illegal conduct that is not attributed to the ShinyHunters. However, Sebastien's involvement with the ShinyHunters was limited, and he denies receiving any profits from the sale or ransom of databases by the ShinyHunters. The actual financial gain to Sebastien from the fraudulent activity was a very small fraction of the overall loss amount.

## II. BACKGROUND

### A. Sebastien's early life

Sebastien is the youngest of three brothers who grew up with a close, extended family with a proud history of service to their country. His parents are former social workers who continued working as civil servants until their retirement. His mother had a management position for a governmental department that provided housing and integration services. His father worked as a civil servant for years before becoming the leader of a federation of parents with children in the public school system.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Sebastien is much younger than his brothers, who are 9 and 11 years older than him. He was seen as the "easy kid." He was polite, curious, and intelligent, and he maintained a wide group of friends and activities. During high school, he developed a strong interest in computers and programming.

In many ways, his childhood was idyllic. However, it was not without some hardships. When he was young, his older brother struggled with heroin and alcohol addiction, and Sebastien would sometimes have to put him to bed after finding him passed out. Sebastien responded to his brother's struggles with concern. Fortunately, his brother eventually became sober and works in IT.

In 2016, when Sebastien was about 15 years old, his mother was diagnosed with cancer. By this time, his older brothers had left home, so Sebastien felt responsible for caring for her, and he entered a state of depression. Fortunately, his teachers noticed and referred him to counseling at school. The following year, his paternal grandmother had a stroke, which upended the family and required them to spend their free time travelling to the South of France to care for her until her death in 2020.

In 2018, Sebastien's other older brother, Jeremy, was severely wounded in a terrorist attack in Strasbourg at a Christmas market. While the bullet wound to the back of his neck was extremely serious, he fortunately recovered and continues to work as a musician.

Finally, in 2019, shortly after Sebastien's high school graduation, his father collapsed and stopped breathing. Sebastien found him and called paramedics. His father suffered from burnout/exhaustion, became depressed, and stopped working for ten months. Later that fall, Sebastien started a five-year computer science program at Epitech IT Institute in Nancy, France.

At first, Sebastien adjusted to school well, but he failed to complete his course projects during his first year. He returned home when the COVID lockdowns started in



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

March 2020. He returned to school in the fall of 2020 to repeat his first year. In the fall of 2021, he participated in an internship in Marrakesh, Morocco. In December 2021, he returned home and informed his father he was not returning to school. Instead, he returned to Morocco to live with friends with whom he travelled around France, Spain, and Morocco.

Sebastien's friends and family will offer him a tremendous amount of support when he returns to France. Sebastien's family and friends have submitted support letters on his behalf. Exhibit 1 (support letters). His parents, a brother, and some friends are expected to attend the sentencing. However, his mother may not be able to attend because of the stroke she suffered several weeks ago.[1] The letters firmly establish several points. First, Sebastien comes from a close-knit family that is proud of their moral values. Nobody condones Sebastien's actions, and they were shocked when they learned what he had done. Second, at his core, Sebastien is a good person who has made some terrible mistakes. He is a bright, curious, and outgoing young man who cares deeply for his family. Third, Sebastien is remorseful for his conduct, and he has given thought to how he needs to live a better life and associate with better friends. Finally, the letters make clear Sebastien will have a vast support network upon his return to France that will assist him through his transition back to school and return to his prior life.

**B. Sebastien's hacking activities**

Sebastien takes full responsibility for his hacking activities and the harm they caused. However, his conduct must be placed in context. His direct involvement with

[1] Catherine's stroke took place after the PSR was written. While Catherine was in the hospital for two weeks, the family did not tell Sebastien or his attorneys until after the final PSR was completed.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

the group ShinyHunters[2] was limited. For a short period of time between early April 2020 until about late June 2020, Sebastien conspired with Mr. Bildstein and others to gain access to company databases using a GitHub hack. Sebastien revised open-source code so he and others could conduct a phishing campaign to steal usernames and passwords for GitHub users to access databases and source code for various companies. The malicious code he wrote was also copied and used by others to conduct a variety of intrusions. However, Sebastien reports that he was not involved in the ransom demands or database sales by ShinyHunters. In fact, despite statements by Mr. Bildstein, Sebastien reports he was not paid any money resulting from ransoms or database sales conducted by ShinyHunters.

To be clear, however, Sebastien was involved in smaller-scale hacking activities starting in late 2019[3] and continuing until his arrest in Morocco. From July 2020 until his arrest, Sebastien sold his malicious code to other hackers, targeted cryptocurrency platforms to withdraw funds, and sold stolen access to credential data. He certainly profited from his activities, but only enough to fund his living expenses and travel to Morocco and Spain. By the time he was arrested in Morocco, he was broke.[4]

---

[2] ShinyHunters is not a cohesive group with a specific membership. *See* PSR ¶ 31. The group existed before Sebastien engaged in hacking activity and continued to claim hacks long after Sebastien's arrest. *Id*.

[3] The PSR includes a partial transcript from a Discord chat in December 2019 where the English translation of Sebastien's chat states, in part, "I don't have any references except for ShinyHunter." PSR ¶ 29. This discovery includes only Sebastien's part of the chat because the other user deleted their chat logs, so the context is not entirely clear. Sebastien, as best as he can recall, believes the other person referred to hacking groups and Sebastien stated he only understood the reference to ShinyHunters, not that ShinyHunters could serve as a reference (i.e., recommendation) for him.

[4] The PSR notes that the conspiracy leader, Bildstein, told investigators he paid Sebastien €100,000. Sebastien denies this. Bildstein is not a reliable reporter. During the same interview, he stated Sebastien played a minor role in ShinyHunters hacking, but later stated he played an important role. Bildstein is an experienced hacker who



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

The person described in the support letters is hard to square with the person who engaged in an extended course of hacking. In his letter to the Court, Sebastien states he had let his studies slide and was depressed, and he started hacking to simply escape his depression without thinking of the consequences. Exhibit 2 (Sebastien's letter to the Court).

Letters from his friends, Nathan Leibel and Mia Amedor, describe Sebastien's descent into depression. Ms. Amedor states he was kind and approachable, but after he dropped out of school he seemed depressed and confided that he had trouble sleeping and was eating less. She also noted he had distanced himself from his inner circle and had "strange" new friends. Exhibit 1 (Mia Amedor letter). Since his arrest, Ms. Amedor has spoken to Sebastien and noted he cried about missing his brother's wedding and was "devastated by his mother's sorrow and his father's efforts" to visit him in prison. *Id*. Sebastien's friend, Nathan Liebel, describes a similar process, where Sebastien went from a helpful and dependable friend to a person who withdrew into himself. Exhibit 1 (Nathan Leibel letter). After Sebastien withdrew, he started to "get into bad company" and seemed sad and arrogant toward his prior circle of friends. *Id*. Mr. Leibel is confident Sebastien has returned to his old self, and he will be there to help "accompany him in this stage of his life." *Id*.

## III. A 25-MONTH SENTENCE IS SUFFICIENT TO ACHIEVE THE GOALS OF SENTENCING.

Sebastien has no objection to the advisory range calculated by the Probation Department. However, the guidelines are neither mandatory nor presumptively

---

previously led another hacking group, GnosticPlayers, and was arrested "many times" for hacking, but was let off due to his mental health issues. *See* https://www.databreaches.net/members-of-gnosticplayers-arrested-and-charged-as-members-of-shinyhunters/. The cited article notes Sebastien's inexperience and naivete, noting his online presence suggested he does not have "highly developed skills" and he made little effort to hide his IP address. *Id*.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

reasonable. *United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 552 U.S. 85 (2007). Ultimately, this Court must impose the minimum term necessary to comply with the goals of sentencing. *Id*; *accord* 18 U.S.C. § 3582.

**A. A 25-month sentence adequately reflects the serious nature of the offense considering Sebastien's age and history.**

Sebastien acknowledges the seriousness of his offense conduct and the financial and emotional harm he caused to others. Although the conduct is serious, that does not mean that a long prison sentence is required; the justice system can acknowledge the seriousness of an offense without imposing a severe sentence. The idea that the length of a prison term is the only way to measure the seriousness of a crime is false. Prison is not the only means to impress upon a defendant, or others, that society abhors the underlying criminal conduct. A 25-month sentence is sufficient to impress upon everybody, including Sebastien and the victims, that the justice system condemns such crimes.

**1. The government's recommendation is too severe when compared to the advisory range for other serious violent offenses.**

The government's recommendation places the seriousness of this offense alongside far more egregious crimes. A sentence of 87 months would be consistent with, or close to, the advisory range for the following offenses:[5]

- Assault with Intent to Commit Murder with Life-Threatening Injury (TOL 28), 78–97 months;
- Sexual Abuse (TOL 27), 70–87 months;
- Tampering with Consumer Products with Life-Threatening Injury (TOL 29), 87–108 months;
- Promoting Prostitution of a Minor (TOL 27), 70–87 months;
- Voluntary Manslaughter (Total Offense Level 26), 63–78 months.

[5] The following ranges assume a guilty plea, acceptance of responsibility, and CHC I.



FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

This is just a small sampling of more serious offenses that would result in an advisory range consistent with the government's anticipated recommendation. These types of offenses involve severe premeditated physical harm that is immediately obvious at the time the offense is committed. In contrast, Sebastien's crimes posed no risk of physical harm to others.

**2. The loss amount does not remotely represent Sebastien's gain.**

In the plea agreement, Sebastien agreed that the loss amount would exceed $6 million. The Probation Department recommends restitution of about $5.1 million. Sebastien also recognizes that the companies and individual victims suffered very real financial loss. However, this Court should be mindful of the manner in which the loss amount is calculated in this case.

The $6 million loss in this case primarily consists of two categories: (1) funds paid to ShinyHunters through either ransom or the sale of databases; and (2) costs of remediation by the hacked companies that comprises the majority of the loss amount. The loss amount does not represent the gain achieved by the hackers as a whole—and Sebastien's personal gain was an even smaller fraction of the loss amount. In this way, the loss amount is a poor proxy for grading the seriousness of the offense.

**3. The advisory guideline range overstates the seriousness of the offense.**

The fraud guideline, USSG § 2B1.1, has been the subject of criticism by professors and federal judges for years. As stated in a recent law review journal, the fraud guideline section "routinely recommends arbitrary, disproportionate, and often draconian sentences to first-time offenders of economic crimes" which has led "many judges to lose confidence entirely in the guideline's recommended sentences." Boss & Kapp, *How the Economic Loss Guideline Lost Its Way, and How to Save It*, Ohio State



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Journal of Criminal Law, Vol. 18:2, 605-631, 606-06 (Spring 2021);[6] *see also United States v. Gupta*, 904 F.Supp.2d 349 (S.D.N.Y. 2012) (The fraud guideline "does not take adequate account of the factors this Court is required by law to consider in imposing sentence."); *United States v. Corsey*, 723 F.3d 366, 377–78 (2nd Cir. 2013) (Underhill, J., concurring) ("[T]he loss guideline is fundamentally flawed, especially as loss amounts climb."), *citing* Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent'g Rep. 167, 168 (2008) ("For the small class of defendants ... convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.").

In U*nited States v. Adelson*, Judge Rakoff began his sentencing opinion in a fraud case by stating:

> This is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law.

441 F.Supp.2d 506, 506 (S.D.N.Y. 2006). In *Adelson*, like here, the defendant was convicted of fraud, but the district court chose to significantly depart from the guidelines range on account of "the inordinate emphasis the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss." *Id*. at 509. The Court continued:

> As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective," tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.

---

[6] Available at https://moritzlaw.osu.edu/sites/default/files/2021-10/how%20the%20economic.pdf.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

*Id*. (citing Stith & Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). Rather than impose the 15–30 year sentence requested by the government, Judge Rakoff imposed a sentence consisting of 42 months of incarceration followed by two years of supervised release where the amount of loss was calculated as between $50 and $100 million. *Id*. at 507–10.

One of the reasons why the range is so high in this case has to do with the structure of the sentencing table itself and seemingly endless enhancements applicable to fraud cases such as this. In addition to an enhancement based on loss amount, the offense level here is increased by another eight levels for number of victims, selling stolen property, creating a fictitious domain name, and committing the scheme outside the United States. At the low end, two-point enhancements add very small increments to the range. As the offense level gets higher, however, each point causes a bigger and bigger jump in months.

What this shows is that not all points are equal. As each enhancement is piled on, the points themselves are added arithmetically, but the months and years they represent increase almost geometrically. A guideline like the fraud guideline is especially problematic. It starts very low and then is almost entirely driven upward by its enhancements. Any one enhancement, standing alone, may make perfect sense. Yet, cumulatively, they apply in a way that makes no sense in many cases. That is partly because each enhancement is itself enhanced by the ones that precede it. A two-level sophisticated-means enhancement, added at the low end of the scale, with no other enhancements, adds zero to the guideline range. Coming on top of all the other enhancements in this case, it adds 15 months, even though it is the same two-level enhancement.

How did it suddenly become so much more potent? It is as if the framers of the guidelines decided to adopt a bowling method of scoring. Three consecutive strikes add



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

up to more than thirty points, because each strike counts once for itself and once again for the succeeding strikes. Under such a scheme, it is all too easy to find oneself striking out. The only upward limit, it seems, is the human lifespan.

Consider Sebastien's situation. He is in CHC I. His crime is entirely nonviolent. Yet, his offense level, combined with the Aggravated Identity Theft count, puts his advisory range (102–121 months) at the level of a someone who solicited a murder[7] because of a flawed mechanical formula. Reliance on the guidelines, in this instance, produces not justice, but nonsense.

**B. A 25-month sentence is warranted in light of Sebastien's history and characteristics.**

Sebastien is just 22 years old, and the offense conduct started when he was just 19 years old. This is the first time he has had contact with any criminal legal system. As thoughtfully addressed in its recommendation, the Probation Department describes how Sebastien's youth is a mitigating factor. Probation Rec. at 6. His brain was not fully matured, and he did not yet have the life experience to fully reflect on his actions and adequately consider the consequences.

To his credit, Sebastien views his young age as an opportunity to move forward. He has the rest of his life ahead of him. He has learned a very hard lesson at an early age, and he is glad that he can move forward with his life with the wisdom he has garnered from his experience.

Sebastien's friends and family all attest to his kind and gentle nature, and his family is especially shocked to see him in his current situation. Unlike many fraud defendants, he is not grandiose or a bully. Instead, he is a thoughtful and good-natured young man who made some very poor decisions and, since his arrest in Morocco approximately 18 months ago, and especially after his transfer to FDC SeaTac, he has

[7] *See* USSG § 2A1.5 (after acceptance of responsibility, a total offense level of 30, with advisory range of 97–121 months).



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

come to more fully value the love and support of his family. He understands that to be able to spend time with his family, he needs to live a crime-free life. As he stated in his letter to the Court, "[t]ime is the most precious thing we have, so I should use it better than getting in trouble and putting myself in prison, especially in these Christmas holidays when my family is going to miss me again." Exhibit 2.

Sebastien understands he deserves a term of imprisonment. However, he is not a person who must be caged because he is beyond repair or redemption.

**C. The conditions of Sebastien's confinement in Morocco and his eventual deportation warrant a mitigated sentence.**

Sebastien was arrested in Morocco on May 31, 2022. He was held at Tiflet II Prison for about eight months. As noted by the Probation Department, prison conditions in Morocco can be "harsh and life threatening. PSR ¶ 32. Sebastien describes the experience as pretty horrific where he and his fellow inmates "lived like animals." *Id*. While in the Moroccan prison, he had limited contact with his family and one legal visit. While Sebastien's family attempted to have him extradited to France rather than the United States, their efforts did not prolong his imprisonment in Morocco. According to translated documents provided in discovery, following his arrest on May 31, 2022, his *first* court appearance took place on July 14, 2022. On July 20, 2022, the court determined he should be extradited to the United States. On October 19, 2022, the court ordered that the seized property should also be turned over to the United States. Finally, he was extradited in late January 2023 and had his first appearance on January 27, 2023. The harsh experience in Morocco has impressed upon him the seriousness of his conduct and has contributed to his commitment to never reoffend. Upon his arrival at FDC SeaTac, Sebastien was frankly relieved and able to focus on his future. He has used his time to "put [his] childish mistakes behind [him] and grow as a better person." Exhibit 2.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Sebastien will be deported upon completion of his sentence. As a result, his conditions in the BOP will be worse than a similarly situated person who is a citizen. He will not be able to go to a minimum-security facility, release early to a halfway house, or get earned-time credits. The harsher terms of confinement suffered by deportable inmates is an appropriate reason to impose a mitigated sentence. *See* PSR ¶ 108, citing *United States v. Cubillos*, 91 F.3d 1342, 1344 (9th Cir. 1996).

**D. A sentence longer than 25 months is not necessary to protect the community.**

Protecting the community is the most important factor in any sentencing hearing. Considering his history and the extraordinary community support he will have upon his release, Sebastien's risk of recidivism is extremely low.

Other factors weigh strongly against recidivism for Sebastien. He is in Criminal History Category I, with no prior arrests or convictions. People in CHC I have the lowest rates of recidivism. USSC, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016) at 5, 18, 19. Furthermore, people with no criminal history points are significantly less likely to reoffend than people with just one point. *Id*. People convicted of fraud offenses have, by far, the lowest recidivism rates among every offense category. *Id*. at 20. Sebastien is a college graduate. The Commission has found that college graduates have the lowest recidivism rate among educational-level groups. *Id*. at 24.

Finally, sentence length does not reduce recidivism. According to the Commission, with the exception of very short sentences (less than six months), the rate of recidivism varies very little by length of prison sentence imposed, and the total offense level "appears to not be correlated with recidivism." *Id*. at 20, 22. Indeed, longer sentences tend to increase a person's risk of recidivism. A sentence that includes



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

too much prison can harm a person's efforts toward rehabilitation. As Judge Hellerstein observed:

> Rehabilitation is also a goal of punishment. 18 U.S.C. § 3553(a)(2)(D). That goal cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment.

*United States v. Carvajal*, 2005 WL 476125 (S.D.N.Y. 2005). Judge Hellerstein's insights are supported by social science research, which shows that longer prison sentences increase a person's risk of recidivism. *See* Gendreau, P., and Goggin, C., *The Effects of Prison Sentences on Recidivism*, Solicitor General of Canada (1999) (http://www.prisonpolicy.org/scans/e100012.htm), at 12–13 (among a group of equally high-risk offenders, those who received longer sentences had a higher recidivism rate).

**E. General deterrence**

As noted by the Probation Department, Sebastien's "arrest, prosecution, extradition, and lengthy detention demonstrate to [him] and others who might consider hacking American companies from abroad, that individuals who engage in this behavior will be investigated, apprehended, and face significant sanction in American courts." Probation Rec. at 7.

Research has refuted the notion of marginal general deterrence, i.e., that more severe sentences serve as a general deterrent to crime. As one criminologist concluded, there is "no real evidence of a deterrent effect for severity." R. Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010). "The fallacy that is marginal general deterrence is highlighted by the fact that nearly 90% of criminologists believe that it does not work, which is similar to the scientific consensus relating to the causes of global warming." Bagaric, Lambropolous,



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

& Xynas, *Excessive Criminal Punishment Amounts to Punishing the Innocent: An Argument for Taking the Parsimony Principle Seriously*, 57 S. TEX. L. REV. 1, 28 (2015).[8]

**F. Retributive justice does not warrant a sentence longer than 25 months.**

A 25-month term of imprisonment is a serious sentence. An additional five years in prison will not stop future hacking nor make the victims whole. An additional five years will only destroy Sebastien's family, crush his hopes of moving on with his life, and cost taxpayers significant sums to house another prisoner who has a very low risk of recidivism.

Sebastien will be punished in other ways beyond the prison sentence imposed by this Court. His arrest and the ShinyHunters investigation have received a great deal of publicity in France. *See* Thierry, G., *Sébastien Raoult affair: the French hacker finally pleads guilty before American justice*, Le Monde with AFP (Sept. 29, 2023).[9] Sebastien will live with the notoriety of his conduct for a long time. More importantly, he will live with the disappointment he knows he visited upon his family.

## IV. CONCLUSION

By statute, this Court is required to impose the minimum term necessary to achieve the goals of sentencing. A term longer than 25 months would be inconsistent with this directive.

---

[8] *See also* National Institute of Justice, *Five Things About Deterrence*, U.S. Department of Justice, Office of Justice Programs (July 2014) (summarizing Daniel Nagin, *Deterrence in the 21st Century*, Crime and Justice in America: 1975–2025 (ed. Michael Tonry, University of Chicago Press, 2013)).

[9] Available at https://www.lemonde.fr/pixels/article/2023/09/28/affaire-sebastien-raoult-le-hackeur-francais-plaide-finalement-coupable-devant-la-justice-americaine_6191484_4408996.html.



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Sebastien is deeply sorry for his conduct and the impact it has had on the companies he hacked, their customers, and his family. He is an intelligent and optimistic young man with bright future, and he will have the support of a positive, close-knit, and involved family.

Finally, Sebastien requests a judicial recommendation for placement on the East Coast so his family can visit more easily.

DATED this 2nd day of January 2024.

Respectfully submitted,

s/ *Dennis Carroll*
Assistant Federal Public Defender
Attorney for Sebastien Raoult



**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**